UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| RICKY L. UNDERHILL, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) Cause No. 3:13-CV-939 JD |
| MARY UHLE, *et al.*, | ) |
| Defendants. | ) |

OPINION AND ORDER

Ricky L. Underhill, a *pro se* prisoner, was granted leave to proceed on a claim that Defendants Mary Uhle, Joseph Townsend, and Matthew Schoettmer violated his rights under the Eighth Amendment by failing to protect him from harm when they denied his requests for protective custody. The defendants moved for summary judgment on July 1, 2014, (DE 36), asserting they were not deliberately indifferent to Underhill's safety.

Despite being given proper notice of the motion for summary judgment (DE 38) and numerous opportunities to respond, (DE 42, 45, 51), Underhill has not responded to the motion for summary judgment. Pursuant to N.D. IND. LOCAL RULE 7-1(d)(4), a party's failure to file a response within the time prescribed may subject the motion to summary ruling. Nevertheless, this "does not mean that a party's failure to submit a timely filing automatically results in summary judgment for the opposing party." *Wienco, Inc. v. Katahn Assoc., Inc.*, 965 F.2d 565, 568 (7th Cir. 1992). Rather, the court still must make the finding that "given the undisputed facts, summary judgment is proper as a matter of law." *Id.*

Summary judgment must be granted when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

Facts

The record establishes that on February 14, 2013, Underhill was transferred to the Miami Correctional Facility ("Miami") from the Branchville Correctional Facility. (Underhill Dep. p. 9.) Once at Miami, Underhill was placed in the H-Housing Unit. (Id. at p. 10.) Mary Uhle ("Uhle") was a Correctional Casework Manager at Miami assigned to the H-Housing Unit. (Uhle Dec. ¶ 2.) On February 15, 2013, Underhill met with Uhle for his orientation. (Uhle Dec. ¶ 4; Underhill Dep. p. 12.) Underhill told Uhle that he might have some issues at Miami with gangs and asked for protective custody. (Uhle Dec. ¶ 5; Underhill Dep. p. 14.) Uhle asked Underhill to complete a witness statement with as much information as Underhill could provide, including names, dates and locations, so that he would have enough evidence to have his protective custody request approved.

(Uhle Dec. ¶ 6.) During their meeting, Underhill confirmed that no specific threat had been made against him at that time. (Underhill Dep. p. 15; Uhle Dec. ¶5.) Underhill did not speak to Uhle again after orientation. (Underhill Dep. p. 15.)

On February 19, 2013, Underhill was moved to the P-Housing Unit. (Uhle Dec. ¶ 7; Underhill Dep. p. 15, 16.) During his move, Underhill passed through the I-Housing Unit and came across offender Etwah Bush, who he recognized from Putnamville. (Underhill Dep. p. 16.) Bush told Underhill that he "needed to pay some money." (Underhill Dep. p. 17.) Joseph Townsend ("Townsend") was the Correctional Caseworker assigned to the P-Housing Unit. (Townsend Dec. ¶ 2.) Underhill went to speak with Townsend. (Underhill Dep. p. 17.) Underhill asked Townsend for enough "Request for Monitoring" forms to cover the Aryan Brotherhood. (Townsend Dec. ¶ 4.) Underhill told Townsend about his encounter with Bush and that there were offenders at Miami who he might have problems with stemming from a debt he had built up with the Aryan Brotherhood at another facility. (Underhill Dep. p. 17; Townsend Dec. ¶ 5.) Underhill asked for protective custody. (Underhill Dep. p. 18.) Townsend explained that Miami did not have a protective custody unit and that Underhill would have to write a letter describing in detail the reason for his move to administrative segregation. (Townsend Dec. ¶ 6.) Townsend advised Underhill that he would pass this information on to the P-Housing Unit Lieutenant. (Underhill Dep. p. 17; Townsend Dec. ¶ 7.) Upon receiving that letter from Underhill, Townsend verified the bed locations of the offenders mentioned in the letter and forwarded the information to Matthew Schoettmer ("Schoettmer"), a Housing Unit Lieutenant for the P-Housing Unit. (Townsend Dec. ¶ 8.)

On March 5, 2013, Schoettmer met with Underhill. (Schoettmer Dec. ¶ 4.) Underhill told Schoettmer of his past history and identified four offenders- Christopher Patterson, Steven

McFarland, Jerry Baugh and Travis Grimes-, all of whom were at Miami, but none of whom were in the same housing unit as Underhill. (Schoettmer Dec. ¶ 5.) Because of this, Schoettmer determined that Underhill would not come into contact with any of those offenders. (Underhill Dep. p. 19, 20.) Even though Underhill was concerned about the four identified offenders, none of them had threatened Underhill as of March 5, 2013. (Schoettmer Dec. ¶ 6; Ex. 1.) Schoettmer told Underhill that if there was no current threat, then nothing could be done. (Schoettmer Dec. ¶ 7; Ex. F.) However, Schoettmer advised Underhill that if anything changes, he could go to any staff member to get help or request protection again. (Schoettmer Dec. ¶ 7; Ex. F.) Underhill then refused to sign a protective custody waiver. (Schoettmer Dec. ¶ 8; Underhill Dep. p. 19.)

After Underhill's meeting with Schoettmer, he came back into Townsend's office and requested "Monitor Status" forms. (Townsend Dec. ¶ 9.) Townsend looked into Underhill's history to validate some of the claims he made. (Townsend Dec. ¶ 9.) Sometime between March 5, 2013 and March 31, 2013, Townsend wrote a memorandum to his supervisor, Christopher Moore, detailing his interactions with Underhill and the results of his research, ultimately recommending that Underhill be placed in a protective custody unit. (Townsend Dec. ¶ 10.)

On March 31, 2013, Underhill sent a letter to Miami Superintendent, Mark Sevier, stating that offender Johnny Ware had come to his cell that day and told him to send $450.00 to one of offender Ware's family members. (Underhill Dep. p. 22, 23; Townsend Dec. Ex. 6.) Johnny Ware was not one of the offenders that Underhill ever expressed concern about. (Underhill Dep. p. 27.) Also on March 31, 2013, Underhill submitted a "Request for Interview" to Schoettmer stating, "You told me to contact you if I was threatened by any offenders due to my past problems" and requested "to be placed in Seg before these offenders [do] any harm to me or my family." (Ex. F.)

Notably, when offender Ware came into Underhill's cell, they also had some sort of physical altercation. (Underhill Dep. p. 25.) Underhill alleges in his complaint that Ware "punched" him. (DE 1). However, Underhill did not include that fact in his letter to Sevier or his "Request for Interview" to Schoettmer. (Underhill Dep. p. 25.)

On the morning of April 1, 2013, Townsend received an e-mail containing Underhill's March 31, 2013, letter to Sevier. (Townsend Dec. ¶ 11; Ex. 3.) On this day, Townsend went to Underhill's cell to speak with him about the situation with offender Ware. (Underhill Dep. p. 23; Townsend Dec. ¶ 12.) Underhill informed Townsend that he was instructed by offender Ware to call his family at 1 p.m. and have them send money to offender Ware's family. (Townsend Dec. ¶ 13.) Townsend had Underhill complete a Request for Protection, in which Underhill stated that offenders Ware and Bush wanted him to send them $450 for past problems at Putnamville and that if it was not sent today then "Ware and his friends were going to mess [Underhill] up and take [his] property." (Underhill Dep. p. 24, Def. Ex. 2.)

Townsend instructed the sergeant on duty to watch to see if the incident actually occurred. (Townsend Dec. ¶ 16; Underhill Dep. p. 26.) Around 1:00 p.m., the sergeant observed Underhill being escorted to the phone by offender Ware. (Townsend Dec. ¶ 17; Underhill Dep. p. 25, 26.) At that time, Townsend advised his supervisor, Moore, of the situation and recommended Underhill be moved to administrative segregation. (Townsend Dec. ¶ 18; Ex. 5.)

Later that day, Townsend completed an Incident Report From, detailing what had occurred and attached Underhill's March 31, 2013, letter. (Townsend Dec. ¶ 20; Ex. 6.) Underhill was then escorted to the Special Control Unit- also referred to as administrative segregation -pending a protective custody review. (Townsend Dec. ¶ 19; Underhill Dep. p. 26; Ex. H.) On June 13, 2013,

Amanda Tobin, a Casework Manager at Miami, submitted a memorandum to Sevier on Underhill's protective custody request. (Ex. I.) Tobin recommended approving that request. (Ex. I.) On June 21, 2013, Underhill was transferred to the New Castle Correctional Facility and placed in the protective custody unit. (Underhill Dep. p. 29.)

Analysis

In his complaint, Underhill claimed the defendants failed to protect him by denying his requests for protective custody. Correctional officials have a constitutional duty to protect inmates "from violence at the hand of other inmates." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Nevertheless, "prisons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more." *Id.* Therefore, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). And, "the fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Instead, the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010). This is a high bar:

> To establish deliberate indifference on the part of the defendants sued individually, Klebanowski needed to show that the officers acted with the equivalent of criminal recklessness, in this context meaning they were actually aware of a substantial harm to Klebanowski's health or safety, yet failed to take appropriate steps to protect him from the specific danger. Klebanowski testified during his deposition that he told officers twice on September 8 that he was afraid for his life and he wanted to be transferred off the tier. Those statements, and the officers' knowledge of the first beating, are the only pieces of evidence in the record that can assist Klebanowski in

> his attempt to show that the officers were aware of any risk to him. We have previously held that statements like those made by Klebanowski are insufficient to alert officers to a specific threat. *Butera*, 285 F.3d at 606 (deeming insufficient to establish deliberate indifference statements by a prisoner that he was "having problems in the block" and "needed to be removed"). In *Butera*, we deemed the inmate's statements insufficient to give notice to the officers because they did not provide the identities of those who threatened the inmate, nor state what the threats were. *Id.*
>
> The facts of this case make clear our reason for requiring more than general allegations of fear or the need to be removed. By Klebanowski's own testimony, the officers knew only that he had been involved in an altercation with three other inmates, and that he wanted a transfer because he feared for his life. He did not tell them that he had actually been threatened with future violence, nor that the attack on September 8 was inflicted by gang members because of his non-gang status. Without these additional facts to rely on, there was nothing leading the officers to believe that Klebanowski himself was not speculating regarding the threat he faced out of fear based on the first attack he suffered. This lack of specificity falls below the required notice an officer must have for liability to attach for deliberate indifference.

*Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (footnote omitted).

Underhill did not communicate any specific or direct threat to any of the defendants prior to March 31, 2013. Until that date, he only discussed his past history with certain gangs at other facilities and his past history with other offenders. This vague description is insufficient to place defendants on notice of any substantial risk of any serious harm before March 31, 2013. *Id.* Without specific knowledge of a threat, defendants cannot be deemed deliberately indifferent to Underhill's safety by refusing to place him in protective custody prior to March 31, 2013. *Lewis,* 107 F.3d at 553.

Nevertheless, when Underhill expressed a general concern for his safety, the defendants did not simply refuse to do anything. Instead, they attempted to assist Underhill receive placement in protective custody. Uhle told Underhill to make a witness statement so that he would have enough evidence to have his protective custody request approved. Similarly, Townsend informed Underhill

that he would have to write a letter describing in detail the reason for the request to be moved into protective custody. And, when Underhill showed concern about certain offenders at Miami, Schoettmer made sure that Underhill was not living in the same housing unit as those offenders to ensure that Underhill would come into contact with any of them. While Schoettmer explained that he could not provide protective custody without the existence of a specific threat, Schoettmer encouraged Underhill to bring any specific threats to their attention.

Following Schoettmer's advice, Underhill did bring a specific threat to the prison's attention on March 31, 2013. Underhill informed prison officials that offender Ware came into his cell and threatened him. In his deposition, Underhill claims that he and offender Ware "got into it" on that date. (Underhill Dep. p. 25.). However, he never shared that information with any prison officials. (Underhill Dep. p. 25; Ex. F). That threat was conveyed to Townsend early the next day. Townsend promptly acted by confirming the threat and then placing Underhill into segregation.

Notably, offender Ware was never identified by Underhill as a potential threat. In fact, Underhill admitted that he did not even know offender Ware until March 31, 2013. (Underhill Dep. p. 21.) Because offender Ware was never identified by Underhill as someone who had posed a specific threat, the defendants had no knowledge that Underhill was at risk from offender Ware. As a result, the defendants cannot be held liable for failing to protect Underhill from offender Ware on March 31, 2013. *Id.* (reasoning that the plaintiff must demonstrate that the defendants had specific knowledge of a threat by the inmate who assaulted him to show deliberate indifference).

While it is regrettable that offender Ware assaulted and threatened Underhill, the defendants cannot be financially liable in this case because they had no prior knowledge of any substantial risk to Underhill's safety.

For the foregoing reasons, the court **GRANTS** the defendants' motion for summary judgment (DE 36). The clerk is **DIRECTED** to enter judgment in favor of defendants Mary Uhle, Joseph Townsend, and Matthew Schoettmer.

SO ORDERED.

ENTERED: February 6, 2015

                /s/ JON E. DEGUILIO
               Judge
               United States District Court